## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| THERESA PEDERNERA, derivatively on behalf of AAC HOLDINGS, INC.,<br><br>     Plaintiff,<br><br>     vs.<br><br>MICHAEL T. CARTWRIGHT, KIRK R. MANZ, ANDREW MCWILLIAMS, MICHAEL J. BLACKBURN, JERRY BOSTELMAN, LUCIUS E. BURCH III, W. LARRY CASH, DARRELL S. FREEMAN, SR., DAVID W. HILLIS, SR., DAVID C. KLOEPPEL, RICHARD E. RAGSDALE, and DARRYL E. ROUSON,<br><br>     Defendants,<br><br>     and<br><br>AAC HOLDINGS, INC.,<br><br>     Nominal Defendant. | Case No. _____<br><br><br><br>**DEMAND FOR JURY TRIAL** |

## SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Theresa Pedernera ("Plaintiff"), by her undersigned attorneys, derivatively and

on behalf of Nominal Defendant AAC Holdings, Inc. ("AAC" or the "Company"), files this

Verified Shareholder Derivative Complaint against Individual Defendants Michael T.

Cartwright, Kirk R. Manz, Andrew McWilliams, Michael J. Blackburn, Jerry Bostelman, Lucius

E. Burch III, W. Larry Cash, Darrell S. Freeman, Sr., David W. Hillis, Sr., David C. Kloeppel,

Richard E. Ragsdale and Darryl E. Rouson (collectively, the "Individual Defendants," and

– 1 –

together with AAC the "Defendants") for breaches of their fiduciary duties as directors and/or officers of AAC, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for her complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AAC, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by AAC's directors and officer from March 8, 2017 through the present (the "Relevant Period").

2.     AAC, founded in 2014, provides services for individuals battling addictions. These services include inpatient and outpatient services that are aimed to help individuals with drug addiction, alcohol addiction, and co-occurring mental/behavioral health issues throughout the United States.

3.     From March 8, 2017 through mid-April 2019 at least, several of the Company's financial reports filed with the SEC on Form 10-Ks and 10-Qs in 2017 through 2018 contained

- 2 -

serious errors that rendered them unreliable. Nevertheless, the Company's SEC filings issued throughout the Relevant Period maintained, *inter alia*, that AAC maintained adequate control over its financial reporting.

4.     On April 16, 2019, the Company issued a press release that announced the Company's fourth quarter 2018 and full fiscal year 2018 financial results for the year ended December 31, 2018 (the "April 2019 Press Release"). The April 2019 Press Release was attached as an exhibit to the Company's Form 8-K filed with the SEC on April 16, 2019.  The April 2019 Press Release disclosed that the Company's previous financial results for the fiscal years ended 2016 and 2017 and all the quarterly reports throughout 2017 and 2018 could no longer be relied upon. The Company further disclosed that it would have to restate all these financials, and thus, numbers for accounts receivable, provision for doubtful accounts, and revenue would all be adjusted. Specifically, the errors resulted in an estimated "cumulative effect adjustment of approximately $23.8 million, recorded as reduction to stockholders' equity on the balance sheet as of January 1, 2016."

5.     On this news, the Company's share price closed on April 16, 2019 at $1.74 per share, a $0.40 drop, or 18.69%, from its closing price of $2.14 per share on April 15, 2019.

6.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact to the investing public that failed to disclose, *inter alia*, that: (1) the Company did not have appropriate procedures and

- 3 -

internal controls over financial reporting and disclosures that would accurately report adjustments related to estimates for accounts receivable, provision for doubtful accounts, and revenue; (2) due to this, AAC misstated its financials and operating results in its annual reports filed for 2016 and 2017 as well as its quarterly reports filed through 2017 and 2018; (3) consequently, AAC had to restate its financial reports for those periods as they were deemed unreliable; and (4) AAC failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

7.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

8.     In response to the false and misleading statements disseminated during the Relevant Period, AAC's stock prices traded at inflated rates. Meanwhile, the Individual Defendants were selling large quantities of their shares at artificially inflated prices, collecting millions of dollars in proceeds.

9.     During the Relevant Period, the Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

10.     Furthermore, during the Relevant Period, three of the Individual Defendants engaged in insider sales, netting proceeds of over $5.1 million.

11.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Over 104,000 shares of the Company's common stock were repurchased between March 2017 and December 2018 for

- 4 -

around $814,271. As the Company stock was actually only worth $1.36 per share, the low price it reached during trading on April 23, 2019, the Company overpaid over $672,189 in total.

12.     As a result of the Individual Defendants' misconduct, which has subjected AAC, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO") and its former CFO, to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Tennessee (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's, CFO's and former CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of AAC's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

- 5 -

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Tennessee or who has minimum contacts with this District to justify the exercise of jurisdiction over them. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

19.     Venue is proper in this District because AAC and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

20.     Plaintiff is a current shareholder of AAC common stock. Plaintiff has continuously held AAC common stock since before the beginning of the Relevant Period. Plaintiff is a citizen of New Jersey.

**Nominal Defendant AAC**

21.     Nominal Defendant AAC is a Nevada corporation with its principal executive offices at 200 Powell Place, Brentwood, TN 37027. AAC stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "AAC."

**Defendant Cartwright**

22.     Defendant Michael T. Cartwright ("Cartwright") has served as Chairman of the Company's Board since 2011 and CEO since 2013. According to the Company's amended annual report filed on a form 10-K/A with the SEC on April 30, 2019 (the "2018 10-K/A"), on April 24, 2019, Defendant Cartwright beneficially owned 4,760,722 shares of the Company's common stock which represented 18.82% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 24, 2019 was $1.54, Cartwright owned over $7.33 million worth of AAC stock.

23.     For the fiscal year ended December 31, 2018, Defendant Cartwright received $950,449 in compensation from the Company. This included $662,594 in salary, $262,500 in non-equity incentive plan compensation, and $25,405 in all other compensation.

- 7 -

24.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Cartwright made the following sales of Company stock, and made no purchases of Company stock:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 5/24/2018 | 9,989 | $11.31 | $112,975.59 |
| 5/23/2018 | 29,011 | $11.57 | $335,657.27 |
| 5/22/2018 | 61,000 | $11.95 | $728,950.00 |
| 3/13/2018 | 100,000 | $11.84 | $1,184,000.00 |
| 11/15/2017 | 250,000 | $9.63 | $2,407,500.00 |

Thus, in total, before the fraud was exposed, he sold 450,000 Company shares on inside information, for which he received approximately $4.76 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

25.     The Company's 2018 10-K/A stated the following about Defendant Cartwright:

Mr. Cartwright has served as Chairman of our Board of Directors since 2011 and currently serves as our Chief Executive Officer, a position he has held since June 2013. Mr. Cartwright has 23 years of experience in the addiction treatment industry. In 2009, Mr. Cartwright co-founded Performance Revolution, LLC (d/b/a FitRx), a company focused on weight management, and served as its chief executive officer until it merged into Forterus, Inc. in 2011. In 1999, he founded Foundations Recovery Network, LLC, a national alcohol and drug treatment company, and served on its Board of Directors and as its president and chief executive officer until 2009. Additionally, in 1995, Mr. Cartwright founded Foundations Associates, a not-for-profit alcohol and drug treatment center in Nashville, Tennessee, and served on its Board of Directors and as its chief executive officer until its purchase by Foundations Recovery Network, LLC in 2007. While at Foundations Associates, Mr. Cartwright conducted over 10

- 8 -

federally funded research studies on dual diagnosis and addiction. Mr. Cartwright also served on the U.S. Senate Help Subcommittee on Substance Abuse and Mental Health Services from 2003 to 2004. Based on his knowledge of the Company, our business and his extensive experience in the addiction treatment industry, we have determined that Mr. Cartwright should serve as Chairman of our Board of Directors.

26.     Upon information and belief, Defendant Cartwright is a citizen of Tennessee.

**Defendant Manz**

27.     Defendant Kirk R. Manz ("Manz") served as the Company's CFO until his resignation on December 31, 2017. According to the Company's Schedule 14A filed with the SEC on April 13, 2018 (the "2018 Proxy Statement"), on April 6, 2018, Defendant Manz beneficially owned 550,234 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 6, 2018 was $11.46, Manz owned over $6.30 million worth of AAC stock.

28.     For the fiscal year ended December 31, 2017, Defendant Manz received $994,346 in compensation from the Company. This included $350,000 in salary, $86,000 in stock awards, $75,000 in non-equity incentive plan compensation, and $483,346 in all other compensation.

29.     The Company's Schedule 14A filed with the SEC on April 12, 2017 (the "2017 Proxy Statement") stated the following about stated the following about Defendant Manz:

*Kirk R. Manz, Chief Financial Officer*. Mr. Manz joined the Company as Chief Financial Officer in January 2011. From 2008 through 2010, Mr. Manz served as chief executive officer of GMD Holdings, Inc. (d/b/a Blast Panel), a digital media company. From 2006 through 2008, Mr. Manz served as managing member of Private Capital Securities, LLC, a boutique investment banking firm. From 2004 through 2006, Mr. Manz served as vice president of investments for Piper Jaffray & Co. Previously, Mr. Manz worked as a fixed income specialist for Stephens Inc. from 2002 through 2004. From 1988 to 2002, Mr. Manz was co-founder and chief executive officer of four communications companies including Igaea, Inc., an international VoIP telecommunications provider. Mr. Manz is a graduate of Vanderbilt University.

30. Upon information and belief, Defendant Manz is a citizen of Tennessee.

**Defendant McWilliams**

31. Defendant Andrew W. McWilliams ("McWilliams") has served as the Company's CFO since January 2018. Prior to that position, Defendant McWilliams served as Chief Accounting Officer from 2014 until January 2018.

32. For the fiscal year ended December 31, 2018, Defendant McWilliams received $887,680 in compensation from the Company. This included $336,875 in salary, $350,400 in stock awards, $175,000 in non-equity incentive plan compensation, and $24,405 in all other compensation.

33. The Company's 2018 Proxy Statement stated the following about Defendant McWilliams:

> *Andrew W. McWilliams, Chief Financial Officer*. Mr. McWilliams joined the Company as Chief Accounting Officer in August 2014 and became Chief Financial Officer effective January 1, 2018 upon the resignation of our former Chief Financial Officer, Kirk R. Manz. From October 1998 through August 2014, Mr. McWilliams worked as an auditor with Ernst & Young LLP, a national public accounting firm. During his tenure with Ernst & Young, Mr. McWilliams served multiple healthcare clients and also gained experience across a variety of corporate transactions, including public offerings of securities and mergers and acquisitions. Mr. McWilliams is a graduate of Georgia State University.

34. Upon information and belief, Defendant McWilliams is a citizen of Tennessee.

**Defendant Blackburn**

35. Defendant Michael J. Blackburn ("Blackburn") has served as a Company director since 2018. He also serves as a member of the Compliance and Quality Care Committee. According to the 2018 10-K/A, on April 24, 2019, Defendant Blackburn beneficially owned 226,589 shares of the Company's common stock. Given that the price per share of the

- 10 -

Company's common stock at the close of trading on April 24, 2019 was $1.54, Blackburn owned over $348,947 worth of AAC stock.

36.     For the fiscal year ended December 31, 2018, Defendant Blackburn received $140,000 in compensation from the Company. This included $70,000 in fees earned and cash paid and $70,000 in stock awards.

37.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Cartwright made the following sales of Company stock, and made no purchases of Company stock:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 3/8/2018 | 15,000 | $12.00 | $180,000.00 |

Thus, in total, before the fraud was exposed, he sold 15,000 Company shares on inside information, for which he received approximately $180,000. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

38.     The Company's 2018 10-K/A stated the following about Defendant Blackburn:

Mr. Blackburn is a certified employee assistance professional, licensed alcohol and drug counselor, labor assistance professional and substance abuse professional and is certified in acute traumatic stress management. He formerly served as our Senior Vice President of Business Development, a position that he held from 2012 to December 2017. He previously served as the Partner and Senior Vice President of Treatment Solutions Network (TSN) from 2007 to 2012 until TSN was acquired by us in August 2012. Mr. Blackburn also served as the Director of Members Assistance Program for Teamsters Local 251 in the Providence, Rhode Island area from 2003-2007. Mr. Blackburn served 30 years on the Providence, Rhode Island Fire Department and retired as a Battalion Chief. He remains a member of the Rhode Island Fire and Police Retirees Union.

- 11 -

Mr. Blackburn received his certificate in drug and alcohol counseling from the University of Rhode Island. Based on his knowledge of the Company, our business and his extensive experience in the addiction treatment industry, we have determined that Mr. Blackburn is qualified to serve as a director.

39.     Upon information and belief, Defendant Blackburn is a citizen of Rhode Island.

**Defendant Bostelman**

40.     Defendant Jerry D. Bostelman ("Bostelman") has served as a Company director since 2012. He also serves as Chairman of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2018 10-K/A, on April 24, 2019, Defendant Bostelman beneficially owned 788,959 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 24, 2019 was $1.54, Bostelman owned over $1.21 million worth of AAC stock.

41.     For the fiscal year ended December 31, 2018, Defendant Bostelman received $170,000 in compensation from the Company. This included $100,000 in fees earned and cash paid and $70,000 in stock awards.

42.     The Company's 2018 10-K/A stated the following about Defendant Bostelman:

Bostelman is chief executive officer of Vaco Holdings, LLC, a professional staffing firm ("Vaco"), which he co-founded in 2002. Prior to co-founding Vaco, Mr. Bostelman was a regional manager for Robert Half International Inc., a provider of staffing services for accounting and finance professionals, where he worked from 1997 through 2001 and prior to that was an auditor for Arthur Anderson. Mr. Bostelman served six years in the Marine Corps Reserves, including a five month active tour of duty in the first Gulf War. The Board of Directors believes that Mr. Bostelman is qualified to serve as a director as a result of his accounting background and his broad management experience serving as regional manager of a national professional staffing firm and as chief executive officer of Vaco.

43.     Upon information and belief, Defendant Bostelman is a citizen of Tennessee.

- 12 -

**Defendant Burch**

44.     Defendant Lucius E. Burch, III ("Burch") has served as a Company director since 2012. He also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2018 10-K/A, on April 24, 2019, Defendant Burch beneficially owned 1,069,479 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 24, 2019 was $1.54, Burch owned over $1.64 million worth of AAC stock.

45.     For the fiscal year ended December 31, 2018, Defendant Burch received $140,000 in compensation from the Company. This included $70,000 in fees earned and cash paid and $70,000 in stock awards.

46.     The Company's 2018 10-K/A stated the following about Defendant Burch:

Since 1989, Mr. Burch has served as the chairman and chief executive officer of Burch Investment Group, formerly Massey Burch Investment Group. Mr. Burch began his tenure at Massey Investment Company (the predecessor of Massey Burch Investment Group) as a financial analyst and portfolio manager in 1968. Mr. Burch is also the chairman and chief executive officer of Collateral Guaranty, a credit enhancement fund. Mr. Burch is the former chairman of CoreCivic, Inc. (f/k/a Corrections Corporation of America) (NYSE:CXW), an operator of private prisons and detention centers and has served on numerous private and public company boards. The Board of Directors believes that Mr. Burch is qualified to serve as a director as a result of his extensive knowledge of and experience in the healthcare industry, his prior extensive board experience, including service on the boards of directors of seven companies traded on NYSE, and his general business and financial acumen.

47.     Upon information and belief, Defendant Burch is a citizen of Tennessee.

**Defendant Cash**

48.     Defendant W. Larry Cash ("Cash") has served as a Company director since 2017. He also serves as Chairman of the Audit Committee and as a member of the Compensation Committee. According to the 2018 10-K/A, on April 24, 2019, Defendant Cash beneficially owned 150,908 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 24, 2019 was $1.54, Cash owned $232,398 worth of AAC stock.

49.     For the fiscal year ended December 31, 2018, Defendant Cash received $210,000 in compensation from the Company. This included $140,000 in fees earned and cash paid and $70,000 in stock awards.

50.     The Company's 2018 10-K/A stated the following about Defendant Cash:

> Mr. Cash most recently served as President of Financial Services, Chief Financial Officer and member of the board of directors of Community Health Systems, Inc. (NYSE:CYH) from 1997 until his retirement in May 2017. Prior to his tenure at Community Health Systems, Mr. Cash served as Vice President and Group Chief Financial Officer of Columbia/HCA Healthcare Corporation (NYSE:HCA) from 1996 to 1997, Senior Vice President Finance and Operations of Humana, Inc. (NYSE:HUM) from 1973 to 1996 and as an accountant at PricewaterhouseCoopers from 1970 to 1973. He currently serves on the board of Cross Country Healthcare (Nasdaq: CCRN) and privately owned HealthChannels Inc. For 11 consecutive years, Mr. Cash was recognized as one of the Top 3 CFOs in the healthcare sector by Institutional Investor magazine. Mr. Cash is also a member of the Nashville Health Care Council. The Board of Directors believes that Mr. Cash is qualified to serve as a director as a result of his extensive knowledge of and experience in the healthcare industry, his prior extensive board experience, including service on the boards of directors of companies traded on NYSE and Nasdaq, and his general business and financial acumen.

51.     Upon information and belief, Defendant Cash is a citizen of Tennessee.

- 14 -

**Defendant Freeman**

52.     Defendant Darrell S. Freeman, Sr. ("Freeman") has served as a Company director since 2013. Freeman serves as the Company's Lead Independent Director. He also serves as Chairman of the Nominating and Corporate Governance Committee, Chairman of the Compliance and Quality Care Committee and as a member of the Compensation Committee and Audit Committee. According to the 2018 10-K/A, on April 24, 2019, Defendant Freeman beneficially owned 360,341 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 24, 2019 was $1.54, Freeman owned over $554,925 worth of AAC stock.

53.     For the fiscal year ended December 31, 2018, Defendant Freeman received $210,000 in compensation from the Company. This included $140,000 in fees earned and cash paid and $70,000 in stock awards.

54.     The Company's 2018 10-K/A stated the following about Defendant Freeman:

Mr. Freeman currently serves as the Executive Managing Director of Zycron, Inc., an information technology services and solutions firm he founded in 1991. Mr. Freeman served as the executive chairman of Zycron, Inc. from the company's formation until April 2017. Mr. Freeman co-founded Tennessee-based Reliant Bank in 2006, and he has served as a board member and a member of the audit and compensation committees of Commerce Union Bancshares, Inc., the holding company for Reliant Bank (Nasdaq:CUBN), since 2006. Since 2016, Mr. Freeman has also served as the chairman of the board of directors of S3 Asset Management, a technology and medical equipment recycling company. Additionally, in 2007 Mr. Freeman co-founded Pinnacle Construction Partners, a construction management firm, and has served as the chairman since 2007. In 2017, Mr. Freeman was appointed to a six-year term on Board of Trustees of Middle Tennessee State University by Governor Bill Haslam. From 2012 to 2016, Mr. Freeman served on the Tennessee Board of Regents. The Board of Directors believes that Mr. Freeman is qualified to serve as a director as a result of his extensive business and financial experience and insight into risk management from his experience co-founding Reliant Bank and his service on its audit committee.

- 15 -

55.     Upon information and belief, Defendant Freeman is a citizen of Tennessee.

**Defendant Hillis**

56.     Defendant David W. Hillis, Sr. ("Hillis") has served as a Company director since 2018. He has also serves as a member of the Compliance and Quality Care Committee. According to the 2018 10-K/A, on April 24, 2019, Defendant Hillis beneficially owned 652,959 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 24, 2019 was $1.54, Hillis owned over $1 million worth of AAC stock.

57.     For the fiscal year ended December 31, 2018, Defendant Hillis received $140,000 in compensation from the Company. This included $70,000 in fees earned and cash paid and $70,000 in stock awards.

58.     The Company's 2018 10-K/A stated the following about Defendant Hillis:

Mr. Hillis most recently served as Chairman and Chief Executive Officer of AdCare, Inc. ("AdCare"), which we acquired in March 2018, where he managed services and acquisitions of facilities specializing in alcohol and drug addiction care. Mr. Hillis also served as Chief Executive Officer of AdCare Hospital of Worcester, Inc., a 114-bed hospital in Worcester, Massachusetts, from 1974 until our acquisition of AdCare and as Chairman of AdCare Criminal Justice Services, Inc., a company providing alcohol and drug treatment services to federal, state and county jails and correctional facilities from 1989 until our acquisition of AdCare. Mr. Hillis has served as Chairman of the board of directors of Fallon Community Health Plan since 2003 and sat on the audit, academic affairs and finance committees of the board of trustees of Endicott College from 2005 until 2014. He is also a former member of the board of directors of the Central Massachusetts Chapter of the American Red Cross. Based on his extensive experience in the addiction treatment industry, we have determined that Mr. Hillis is qualified to serve as a director.

59.     Upon information and belief, Defendant Hillis is a citizen of Massachusetts.

**Defendant Kloeppel**

60.     Defendant David C. Kloeppel ("Kloeppel") served as a Company director from 2013 until his resignation in May 2019. He has also served as a member of the Compensation Committee and as a member of the Audit Committee. According to the 2018 10-K/A, on April 24, 2019, Defendant Kloeppel beneficially owned 310,988 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 24, 2019 was $1.54, Kloeppel owned over $478,921 worth of AAC stock.

61.     For the fiscal year ended December 31, 2018, Defendant Kloeppel received $170,000 in compensation from the Company. This included $100,000 in fees earned and cash paid and $70,000 in stock awards.

62.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kloeppel made the following sales of Company stock, and made no purchases of Company stock:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 4/2/2018 | 5,000 | $11.32 | $56,600.00 |
| 3/15/2018 | 5,000 | $12.02 | $60,100.00 |
| 1/29/2018 | 10,000 | $9.50 | $95,000.00 |

Thus, in total, before the fraud was exposed, he sold 20,000 Company shares on inside information, for which he received approximately $211,700. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

- 17 -

63.     The Company's 2018 10-K/A stated the following about Defendant Kloeppel:

Mr. Kloeppel is chairman of Eventa Global, Inc., a travel services company he founded in 2014. Mr. Kloeppel also serves as chief executive officer of Domus Hospitality, LLC, an entity focused on investment in the hospitality industry that he founded in 2013 and as a director of Cloudbeds, a hotel management software company, since 2013. Mr. Kloeppel served as president and chief operating officer of Ryman Hospitality Partners (NYSE:RHP) (f/k/a Gaylord Entertainment Company (NYSE:GET)) from 2009 to 2012; as president and chief financial officer from 2008 to 2009; and as executive vice president and chief financial officer from 2001 until 2008. Prior to joining Gaylord Entertainment Company, he worked in the Mergers and Acquisitions Department at Deutsche Bank in New York, where he served as vice president and was responsible for that department's activities in the lodging, leisure and real estate sectors. Mr. Kloeppel served as a director of FelCor Lodging Trust Inc. (NYSE:FCH) from 2005 to 2008, and was a member of the audit and compensation committees. Mr. Kloeppel currently serves on the Board of Visitors of the Owen Graduate School of Management at Vanderbilt University and the Board of Trustees at University School of Nashville. The Board of Directors believes that Mr. Kloeppel is qualified to serve as a director as a result of his prior public company executive officer experience, his extensive corporate governance experience as an officer and director of publicly traded companies and his general business and financial acumen.

64.     Upon information and belief, Defendant Kloeppel is a citizen of Tennessee.

**Defendant Ragsdale**

65.     Defendant Richard E. Ragsdale ("Ragsdale") served as a Company director from 2012 until his resignation effective May 15, 2018 at the Company's annual meeting. According to the 2018 Proxy Statement, on April 6, 2018, Defendant Ragsdale beneficially owned 75,104 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 6, 2018 was $11.46, Ragsdale owned $883,223 worth of AAC stock.

66.     For the fiscal year ended December 31, 2017, Defendant Ragsdale received $135,600 in compensation from the Company. This included $42,000 in fees earned and cash paid and $75,920 in stock awards.

- 18 -

67.     The Company's 2017 Proxy Statement stated the following about Defendant Ragsdale:

> Mr. Ragsdale has co-founded and operated 17 healthcare corporations during his career. After beginning his career with Chase Manhattan Bank in New York, Mr. Ragsdale served as president and treasurer of Hospital Affiliates International, Inc., one of the country's first hospital management firms, from 1973 to 1977, and served as vice president and chief financial officer of INA Health Care Group from 1977 to 1981. In 1981, he co-founded a hospital management company, Republic Health Corporation, which went public in 1983 and was acquired by an investor group in 1986. In 1985, Mr. Ragsdale co-founded Community Health Systems, Inc. (NYSE:CYH), a hospital management company, and served as chairman from 1985 to 1996. In 2000, he co-founded HealthMont Inc., an operator of community hospitals, and served as chairman from its formation in early 2000 until its acquisition by SunLink in October 2003. Mr. Ragsdale has been a private investor since his retirement in 2003. Mr. Ragsdale has served on the boards of numerous public and private companies and from June 2008 to June 2016 served as a director of BreatheAmerica, Inc., an operator of allergy, asthma and sinusitis treatment centers. The Board of Directors believes that Mr. Ragsdale is qualified to serve as a director as a result of his extensive knowledge of and experience in the healthcare industry, his prior extensive public company board experience and his general business and financial acumen.

68.     Upon information and belief, Defendant Ragsdale is a citizen of Tennessee.

**Defendant Rouson**

69.     Defendant Darryl E. Rouson ("Rouson") served as a Company director from 2017 until his resignation effective May 15, 2018 at the Company's annual meeting.

70.     For the fiscal year ended December 31, 2017, Defendant Ragsdale received $80,000 in compensation from the Company. This included $80,000 in fees earned and cash paid.

71.     The Company's 2017 Proxy Statement stated the following about Defendant Rouson:

- 19 -

Since November 2016, Darryl E. Rouson has served as a Florida State Senator and previously served in the Florida House of Representatives from April 2008 to November 2016. In March 2017, Florida House Speaker Richard Corcoran appointed Sen. Rouson to the Constitutional Revision Commission, and in 2007 then-Governor Charlie Crist appointed Sen. Rouson to a one-year term on the Taxation and Budget Reform Commission. Since June 2014, Sen. Rouson has also practiced law with the Dolman Law Group in St. Petersburg, Florida. In 2003, he was appointed a chair of the Substance Abuse and Addictions Task Force for the National Bar Association. Sen. Rouson also served as the President of the St. Petersburg NAACP from 2000 to 2005 and President of the St. Petersburg Black Chamber of Commerce from 2003 to 2004. Sen. Rouson received his Bachelor of Arts from Xavier University in New Orleans, Louisiana and his Juris Doctor from the University of Florida in Gainesville, Florida. The Board of Directors believes that Mr. Rouson is qualified to serve as a director as a result of his personal experience in addiction, rehabilitation and recovery issues, as well as his research, presentations and involvement in recovery matters. He has demonstrated a commitment to public service and activism

72.     Upon information and belief, Defendant Rouson is a citizen of Florida.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

73.     By reason of their positions as officers, directors and/or fiduciaries of AAC and because of their ability to control the business and corporate affairs of AAC, the Individual Defendants owed AAC and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AAC in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AAC and its shareholders so as to benefit all shareholders equally.

74.     Each director and officer of the Company owes to AAC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

- 20 -

75. The Individual Defendants, because of their positions of control and authority as directors and/or officers of AAC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

76. To discharge their duties, the officers and directors of AAC were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

77. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of AAC, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised AAC's Board at all relevant times.

78. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management,

- 21 -

earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

79.     To discharge their duties, the officers and directors of AAC were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of AAC were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, Tennessee, the United States, and pursuant to AAC's own internal guidelines, including its Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how AAC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of AAC and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AAC's operations would comply with all laws and AAC's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

80.     Each of the Individual Defendants further owed to AAC and the shareholders the duty of loyalty requiring that each favor AAC's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

81.     At all times relevant hereto, the Individual Defendants were the agents of each other and of AAC and were at all times acting within the course and scope of such agency.

- 23 -

82. Because of their advisory, executive, managerial, and directorial positions with AAC, each of the Individual Defendants had access to adverse, non-public information about the Company.

83. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AAC.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

84. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

85. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while the Company repurchased its own stock.

86. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate

- 24 -

applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of AAC was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

87.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

88.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AAC, and was at all times acting within the course and scope of such agency.

**<u>AAC'S CODE OF CONDUCT</u>**

89.     Pursuant to the Company's Code of Business Conduct and Conduct (the "Code of Conduct"), the Code of Conduct is mandatory and "applicable to the Company's directors and employees."

90.     The Code of Conduct provides, in the section titled "Accurate Periodic Reports and Other Public Communications" that:

> Accuracy, reliability and timeliness in the preparation of all business records, financial statements, periodic reports to regulatory and other government agencies and other public communications are of critical importance to the corporate decision-making process and to the proper discharge of the Company's financial, legal and reporting obligations. Employees must exercise the highest standard of

- 25 -

care in preparing such materials. To ensure the quality of such materials, the Company has established the following guidelines.

a. The Company and its employees must comply with generally accepted accounting principles at all times.

b. All books and records must fairly and accurately reflect the Company's transactions, assets, liabilities, revenues and expenses.

c. The Company maintains a system of internal accounting controls and disclosure controls that provides reasonable assurances to management that all transactions are properly recorded and disclosed.

d. The Company's accounting records must not contain any false or intentionally misleading entries.

e. No transaction may be intentionally misclassified as to accounts, departments or accounting periods or in any other manner.

f. All transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period. No false or fictitious invoices may be paid or created.

g. No information may be concealed from the internal auditors or the independent auditors.

h. The Company will maintain an adverse event management standard that provides reasonable assurances to management that all material events concerning patient care and safety, all material communications with regulators and legal authorities, and all material developments in litigation are properly reported to the Board of Directors and disclosed, as deemed appropriate.

Furthermore, each employee and director must promptly disclose to the Chief Legal Officer or Chief Compliance Officer any information he or she may have concerning (i) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (ii) any fraud, whether or not material, involving management or other employees of the Company who have a significant role in the Company's financial reporting, disclosures or internal controls.
If an employee or director believes that the Company's books and records are not being maintained in accordance with these requirements, he or she should report the matter immediately to the Chief Legal Officer or Chief Compliance Officer

91.     The Code of Conduct provides, in the section titled "Compliance with Laws, Rules and Regulations and Company Policies," in relevant part, that:

> Employees and directors are expected to comply with both the letter and spirit of all applicable governmental laws, rules and regulations and to promptly report any suspected violations of governmental laws, rules and regulations to the Chief Legal Officer or Chief Compliance Officer. Further, employees and directors are expected to comply with all Company policies and procedures, specifically including facility-specific policies and procedures, and to promptly report any suspected violations of Company policies or procedures to his or her immediate supervisor or to the Chief Compliance Officer. No one will be subject to retaliation because of a good faith report of a suspected violation. The Company provides anonymous reporting mechanisms for employees' use in reporting concerns about financial reporting, accounting or auditing matters. Employees who fail to comply with applicable laws, rules or regulations may be subject to disciplinary measures, up to and including termination of employment.

> a.  Insider Information and Securities Trading. The Company has adopted an Insider Trading Policy applicable to officers, directors, employees, consultants and contractors of the Company and its subsidiaries, as well as immediate family members and household members of such persons. The Insider Trading Policy is incorporated by reference into this Code. The Company expects officers, directors, employees, consultants and contractors to comply strictly with applicable insider trading laws and the Insider Trading Policy.

**AAC's Insider Trading Policy**

92.     The Insider Trading Policy, which is referenced in the Code of Conduct, provides, in the section titled "Statement of the Policy," that:

> It is the policy of the Company that no director, officer or other employee of the Company (or any other person designated by this Policy or by the Compliance Officer as subject to this Policy) who is aware of material nonpublic information relating to the Company may, directly, or indirectly through family members or other persons or entities:

> 1.  Engage in transactions in Company Securities, except as otherwise specified in this Policy under the headings "Transactions Under Company Plans," "Transactions Not Involving a Purchase or Sale" and "Rule 10b5-1 Plans;"

> 2.  Recommend the purchase or sale of any Company Securities;

- 27 -

3.      Disclose material nonpublic information to persons within the Company whose jobs do not require them to have that information, or outside of the Company to other persons, including, without limitation, family, friends, business associates, investors and expert consulting firms, unless any such disclosure has been broadly and publicly disseminated in accordance with the Company's Regulation FD Policy; or

4.      Assist anyone engaged in the above activities.

In addition, it is the policy of the Company that no director, officer or other employee of the Company (or any other person designated as subject to this Policy) who, in the course of working for the Company, learns of material nonpublic information about a company with which the Company does business, including a customer or supplier of the Company, may trade in that company's securities until the information becomes public or is no longer material.

There are no exceptions to this Policy except as specifically noted herein. Transactions that may be necessary or justifiable for independent reasons (such as the need to raise money for an emergency expenditure), or small transactions, are not excepted from this Policy. The securities laws do not recognize any mitigating circumstances, and, in any event, even the appearance of an improper transaction must be avoided to preserve the Company's reputation for adhering to the highest standards of conduct.

93.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, and failing to report the same.

## AUDIT COMMITTEE CHARTER

94.     Under the Amended and Restated Audit Committee Charter (the "Audit Committee Charter"), the members of the Committee's duties and responsibilities include, *inter alia*: "to oversee the Company's financial reporting process on behalf of the Board and report the

- 28 -

results of its activities to the Board." The Audit Committee Charter states the following, in relevant part, about some of the responsibilities of the Audit Committee:

> . . . the Committee shall be directly responsible for, and have sole authority as to, the appointment, retention and termination, compensation (on behalf of the Company) and oversight of the work of any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or to perform audit, review or attestation services, which firm shall also report directly to the Committee.

*    *    *

> In performing its functions, the Committee shall undertake those tasks and responsibilities that, in its judgment, would contribute most effectively to and implement the purposes of the Committee.

## COMPLIANCE AND QUALITY CARE COMMITTEE CHARTER

95.      According to the Company's Charter for the Compliance and Quality Care Committee (the "Compliance and Quality Care Charter"), the purpose of the Compliance and Quality Care Committee:

> . . . shall be to assist the Board in fulfilling its oversight responsibilities relating to (a) the Corporation's compliance with applicable laws and regulations, (b) the Corporation's compliance program, (c) the adequacy of the Corporation's internal and external compliance controls, (d) the effectiveness of management policies, procedures and practices relating to compliance, and (e) the Corporation's policies and procedures relating to the delivery of quality care to clients. The Committee shall advise the Board as to the status of the Corporation's compliance program and ongoing developments relating to compliance and quality matters.

96.      In the section titled "Responsibilities" the Compliance and Quality Care Charter separates the committee's responsibilities into "Compliance Related Duties" and "Quality Related Duties." The Compliance Related Duties are, inter alia, as follows:

> *Compliance Related Duties*

> The Committee shall have the following goals and responsibilities with respect to the Corporation's compliance efforts:

- 29 -

(a) Provide oversight of the Corporation's compliance with applicable laws and regulations and communicate significant compliance issues to the Board and to other Board committees;

(b) Review significant compliance risk areas and the steps management has taken to monitor, control and report such compliance risk exposures;

(c) Regularly review reports of the General Counsel on litigation, any material reports or inquiries received by the Corporation from regulators or governmental agencies, and other matters, including the scope and effectiveness of compliance policies and programs;

(d) Review reports of the Corporation's Compliance Committee;

(e) Review and evaluate, at least annually, the effectiveness of the Corporation's compliance staff, the Compliance Committee and compliance and ethics program;

(f) Review and approve compliance related policies and procedures, including employee standards of conduct;

(g) Report compliance issues that may have significant financial implications to the Corporation's Audit Committee and otherwise assist the Audit Committee in the discharge of such committee's obligations related to such compliance issues; and

(h) Meet regularly in executive session with the Corporation's Chief Compliance Officer.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

97.    AAC is a provider of substance use treatment services. AAC provides inpatient and outpatient services for individuals with drug addiction, alcohol addiction, and co-occurring mental/behavioral health issues. According to the Company's website, AAC is the only publicly traded company in the addiction treatment space.[1]

---

[1] https://americanaddictioncenters.org/, last visited August 2, 2019.

- 30 -

98. As of December 31, 2018, AAC operated 11 inpatient treatment facilities throughout the United States.

99. Throughout the Relevant Period, AAC did not maintain control over its financial statements and operational statements. This caused the Company's financial reports throughout the Relevant Period to be materially false and misleading.

**False and Misleading Statements**

*2016 10-K*

100. On March 8, 2017, the Company filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2016 on a Form 10-K (the "2016 10-K"). The 2016 10-K was signed by Defendants Cartwright, Manz, McWilliams, Freeman, Bostelman, Burch, Kloeppel and Ragsdale.

101. For the 2016 fiscal year, AAC reported net loss of $0.59 million attributable to Company stockholders, or $0.03 per diluted share, on net revenue of $279.77 million, compared to net income of $11.17 million attributable to Company stockholders, or $0.48 per diluted share, on revenue of $212.26 million for the prior year.

102. The 2016 10-K further stated that the Company, for the fiscal year ended December 31, 2016, had accounts receivable of $45.83 million, net of allowances of $87.33 million and a provision for doubtful accounts of $21.49 million.

103. The 2016 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

> As of the end of the period covered by this report, our management conducted an evaluation, with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act). Based on

- 31 -

this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

104. The 2016 10-K, stated in relevant part, about the Company's internal control over financial reporting:

Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an assessment of the effectiveness of our internal control over financial reporting based on the framework in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on our assessment under the framework in Internal Control — Integrated Framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2016.

*     *     *

There have been no changes in our internal control over financial reporting during the fourth quarter ended December 31, 2016, that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting.

105. The 2016 10-K also contained general statements about the risk of errors in the Company's financial reporting. To this point, the 2016 10-K stated, "Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation."

106. Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Cartwright and Manz attesting to the accuracy of the 2016 10-K.

- 32 -

*2017 Proxy Statement*

107.    On April 12, 2017, the Company filed its 2017 Proxy Statement. Defendants Cartwright, Bostelman, Burch, Freeman, Kloeppel, Ragsdale, Rouson and non-defendant Jerrod N. Menz solicited the 2017 Proxy Statement which contained material misstatements and omissions.[2]

108.    The 2017 Proxy Statement stated, that the Company had a Code of Business Conduct and Ethics (the Code of Conduct) posted on the Company's website. The Code of Conduct applies to "[the Company's] officers, directors and employees."

109.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evident by the numerous false and misleading statements alleged herein, the insider trading engaged in by three of the Individual Defendants, and the Individual Defendant's failures to report violations of the Code of Conduct.

110.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements. The 2017 Proxy Statement stated that "[the Company] believe[s] such performance-based incentive compensation aligns our named executive officers' compensation to the Company's goals" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

111.    The 2017 Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading.

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud.

Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company did not have appropriate procedures and internal controls over financial reporting and disclosures that would accurately report adjustments related to estimates for accounts receivable, provision for doubtful accounts, and revenue; (2) due to this, AAC misstated its financials and operating results in its annual reports filed for 2016 and 2017 as well as its quarterly reports filed through 2017 and 2018; (3) consequently, AAC had to restate its financial reports for those periods as they were deemed unreliable; and (4) AAC failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *1Q17 10-Q*

112.    On May 4, 2017, AAC filed its quarterly report for the fiscal quarter ended March 31, 2017 on Form 10-Q (the "1Q17 10-Q"). For the quarter, AAC reported net loss of $0.60 million attributable to Company stockholders, or $0.03 per diluted share, on net revenue of $73.04 million, compared to net income of $0.59 million attributable to Company stockholders, or $0.03 per diluted share, on net revenue of $65.35 million for the same quarter in the prior year.

113.    The 1Q17 10-Q further stated that the Company, for the three months ended March 31, 2017, had accounts receivable of $13.4 million, accounts receivable, net of allowances of $94.14 million for March 31, 2017 and a provision for doubtful accounts of $6.59 million.

114.    The 1Q17 10-Q contained nearly identical statements as those provided in ¶¶ 103-104 regarding the efficacy of the Company's internal controls over financial disclosures and reporting.

- 34 -

115.    Attached to the 1Q17 10-Q were SOX certifications signed by Defendants Cartwright and Manz, attesting to the accuracy of the 1Q17 10-Q.

*2Q17 10-Q*

116.    On August 3, 2017, AAC filed its quarterly report for the fiscal quarter ended June 30, 2017 on Form 10-Q (the "2Q17 10-Q"). For the quarter, AAC reported net loss of $1.29 million attributable to Company stockholders, or $0.08 per diluted share, on net revenue of $78.04 million, compared to net income of $0.87 million attributable to Company stockholders, or $0.04 per diluted share, on revenue of $71.54 million for the same quarter in the prior year.

117.    The 2Q17 10-Q further stated that the Company, for the six months ended June 30, 2017,  had accounts receivable of $25.28 million, accounts receivable, net of allowances of $96.53 million for June 30, 2017, and a provision for doubtful accounts of $16.08 million for the six months ended June 30, 2017 and $9.5 million for 2Q17.

118.    The 2Q17 10-Q contained nearly identical statements as those provided in ¶¶ 103-104 regarding the efficacy of the Company's internal controls over financial disclosures and reporting.

119.    Attached to the 2Q17 10-Q were SOX certifications signed by Defendants Cartwright and Manz, attesting to the accuracy of the 2Q17 10-Q.

*3Q17 10-Q*

120.    On November 6, 2017, AAC filed its quarterly report for the fiscal quarter ended September 30, 2017 on Form 10-Q (the "3Q17 10-Q"). For the quarter, AAC reported net income of $0.76 million attributable to Company stockholders, or $0.03 per diluted share, on net revenue of $80.42 million, compared to net loss of $2.53 million attributable to Company

- 35 -

stockholders, or $0.11 per diluted share, on net revenue of $70.53 million for the same quarter in the prior year.

121.    The 3Q17 10-Q further stated that the Company, for the nine months ended September 30, 2017, had accounts receivable of $30.98 million, accounts receivable, net of allowances of $92.55 million for September 30, 2017, and a provision for doubtful accounts of $25.77 million for the nine months ended September 30, 2017 and $9.68 million for the three months ended September 30, 2017.

122.    The 3Q17 10-Q contained nearly identical statements as those provided in ¶¶ 103-104 regarding the efficacy of the Company's internal controls over financial disclosures and reporting.

123.    Attached to the 3Q17 10-Q were SOX certifications signed by Defendants Cartwright and Manz, attesting to the accuracy of the 3Q17 10-Q.

***2017 10-K***

124.    On February 23, 2018, the AAC filed its annual report with the SEC announcing its financial results for the quarter and year ended December 31, 2017 on Form 10-K (the "2017 10-K"). The 2017 10-K was signed by Defendants Cartwright, McWilliams, Freeman, Blackburn, Bostelman, Burch, Cash, Kloeppel, Ragsdale and Rouson.

125.     For the 2017 fiscal year, AAC reported net loss of $20.58 million attributable to Company stockholders, or $0.88 per diluted share, on net revenue of $317.64 million, compared to net loss of $0.59 million attributable to Company stockholders, or $0.03 per diluted share, on revenue of $279.77 million for the prior year.

- 36 -

126.    The 2017 10-K further stated that the Company, for the fiscal year ended December 31, 2017, had accounts receivable of $43.68 million, net of allowances of $94.10 million and a provision for doubtful accounts of $36.91 million.

127.    The 2017 10-K contained nearly identical statements as those provided in ¶¶ 103-104 regarding the efficacy of the Company's internal controls over financial disclosures and reporting.

128.    Attached to the 2017 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Cartwright and McWilliams attesting to the accuracy of the 2017 10-K.

### 2018 Proxy Statement

129.    On April 13, 2018, the Company filed its 2018 Proxy Statement. Defendants Cartwright, Blackburn, Bostelman, Burch, Cash, Freeman, Hillis and Kloeppel solicited the 2017 Proxy Statement which contained material misstatements and omissions.[3]

130.    The 2018 Proxy Statement stated that the Company had a Code of Business Conduct and Ethics posted on the Company's website. The Code of Conduct applies to "[the Company's] officers, directors and employees."

131.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evident by the numerous false and misleading statements alleged herein, the insider trading engaged in by three of the Individual Defendants, and the Individual Defendant's failures to report violations of the Code of Conduct.

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud.

- 37 -

132.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ performance-based elements. The 2018 Proxy Statement stated that "[the Company] believe[s] such performance-based incentive compensation aligns our named executive officers' compensation to the Company's goals" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

133.    The 2018 Proxy Statement was materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company did not have appropriate procedures and internal controls over financial reporting and disclosures that would accurately report adjustments related to estimates for accounts receivable, provision for doubtful accounts, and revenue;  (2) due to this, AAC misstated its financials and operating results in its annual reports filed for 2016 and 2017 as well as its quarterly reports filed through 2017 and 2018; (3) consequently, AAC had to restate its financial reports for those periods as they were deemed unreliable; and (4) AAC failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *1Q18 10-Q*

134.    On May 9, 2018, AAC filed a quarterly report for the fiscal quarter ended March 31, 2018 on Form 10-Q (the "1Q18 10-Q"). For the quarter, AAC reported net loss of $0.20 million attributable to Company stockholders, or $0.01 per diluted share, on net revenue of

$78.47 million, compared to net loss of $0.60 million attributable to Company stockholders, or $0.03 per diluted share, on net revenue of $73.04 million for the same quarter in the prior year.

135. The 1Q18 10-Q further stated that the Company, for the three months ended March 31, 2018, had accounts receivable of $1.13 million, accounts receivable, net of allowances of $99.58 million for March 31, 2018 and did not include an amount for provision for doubtful accounts.

136. The 1Q18 10-Q contained nearly identical statements as those provided in ¶¶ 103-104 regarding the efficacy of the Company's internal controls over financial disclosures and reporting.

137. Attached to the 1Q18 10-Q were SOX certifications signed by Defendants Cartwright and McWilliams, attesting to the accuracy of the 1Q18 10-Q.

*2Q18 10-Q*

138. On August 3, 2018, AAC filed its quarterly report for the fiscal quarter ended June 30, 2018 on Form 10-Q (the "2Q18 10-Q"). For the quarter, AAC reported net loss of $3.01 million attributable to Company stockholders, or $0.12 per diluted share, on net revenue of $86.76 million, compared to net loss of $1.92 million attributable to Company stockholders, or $0.08 per diluted share, on revenue of $78.04 million for the same quarter in the prior year.

139. The 2Q18 10-Q further stated that the Company, for the six months ended June 30, 2018, had accounts receivable of $0.72 million, accounts receivable, net of allowances of $97.36 million for June 30, 2018, and a provision for doubtful accounts of $0.37 million for the three months and the six months ended June 30, 2018.

- 39 -

140.     The 2Q18 10-Q contained nearly identical statements as those provided in ¶¶ 103-104 regarding the efficacy of the Company's internal controls over financial disclosures and reporting.

141.     Attached to the 2Q18 10-Q were SOX certifications signed by Defendants Cartwright and McWilliams, attesting to the accuracy of the 2Q18 10-Q.

### 3Q18 10-Q

142.     On November 6, 2018, AAC filed its quarterly report for the fiscal quarter ended September 30, 2018 on Form 10-Q (the "3Q18 10-Q"). For the quarter, AAC reported net loss of $11.49 million attributable to Company stockholders, or $0.47 per diluted share, on net revenue of $77.47 million, compared to net income of $0.76 million attributable to Company stockholders, or $0.03 per diluted share, on net revenue of $80.42 million for the same quarter in the prior year.

143.     The 3Q18 10-Q further stated that the Company, for the nine months ended September 30, 2018, had accounts receivable of $3.50 million, accounts receivable, net of allowances of $94.58 million for September 30, 2018, and a provision for doubtful accounts of $0.37 million for the nine months ended September 30, 2018.

144.     The 3Q18 10-Q contained nearly identical statements as those provided in ¶¶ 103-104 regarding the efficacy of the Company's internal controls over financial disclosures and reporting.

145.     Attached to the 3Q18 10-Q were SOX certifications signed by Defendants Cartwright and McWilliams, attesting to the accuracy of the 3Q18 10-Q.

- 40 -

146. The statements in ¶¶ 100-106, ¶¶ 112-128 and ¶¶ 134-145 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company did not have appropriate procedures and internal controls over financial reporting and disclosures that would accurately report adjustments related to estimates for accounts receivable, provision for doubtful accounts, and revenue; (2) due to this, AAC misstated its financials and operating results in its annual reports filed for 2016 and 2017 as well as its quarterly reports filed through 2017 and 2018; (3) consequently, AAC had to restate its financial reports for those periods as they were deemed unreliable; and (4) AAC failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

147. On April 16, 2019, the Company issued the April 2019 Press Release. The April 2019 Press Release was attached as an exhibit to the Company's Form 8-K filed with the SEC on April 16, 2019. The April 2019 Press Release announced the Company's fourth quarter 2018 and full fiscal year ended December 31, 2018 financial results. The April 2019 Press Release further provided guidance for fiscal year 2019.

148. The April 2019 Press Release also revealed that the Company's previous financial results for the fiscal years ended 2016 and 2017 and all the quarterly reports filed with the SEC throughout 2017 and 2018 could no longer be relied upon as they contained material misstatements related to AAC's estimates for accounts receivable, provision for doubtful accounts, and revenue. Consequently, the April 2019 Press Release further disclosed that AAC

- 41 -

was required to restate the respective financial statements, and thus adjust its numbers for accounts receivable, provision for doubtful accounts, and revenue for the Relevant Period. In relevant part, the April 2019 Press Release stated:

**Restatement**

On March 29, 2019, the Company, the Audit Committee of the Company's Board of Directors and executive management, in consultation with the Company's independent registered public accounting firm, BDO USA, LLP ("BDO"), determined that adjustments to certain of its previously issued annual and interim financial statements were necessary, and that those annual and interim financial statements could no longer be relied upon. The adjustments related to estimates of accounts receivable, provision for doubtful accounts and revenue for the relevant periods described below, as well as the related income tax effects. Certain other immaterial reclassifications within the financial statements are also reflected in the adjustments. The restatements do not implicate misconduct with respect to the Company, its management or its employees.

The Company's previously issued annual financial statements are included in the Company's Annual Report on Form 10-K for the years ended December 31, 2017 and 2016 and the unaudited financial statements and included in the Company's quarterly reports on Form 10-Q for the quarters ended September 30, 2018 and 2017, June 30, 2018 and 2017, and March 31, 2018 and 2017, have been restated in the Company's 2018 Annual Report on Form 10-K for the year ended December 31, 2018 to properly reflect these corrections.

The adjustments do not relate to the change in estimate that the Company made during the three months ended September 30, 2018 and effective as of July 1, 2018, regarding its estimate of the collectability of accounts receivable, specifically relating to accounts where the Company has received a partial payment from a commercial insurance company, and the Company continues to pursue additional collections for the balance that it estimates remains outstanding or "partial payment accounts receivable".

All comparisons to prior period results contained in this release are presented on an as restated basis.

149.    On this news, the Company's share price dropped $0.40 per share, or 18.69% from closing at $2.14 per share on April 15, 2019 to close at $1.74 per share on April 16, 2019.

- 42 -

150.    The Company's restated financials for the for the fiscal years ended 2016 and 2017 and the quarterly reports filed with the SEC for the quarters ended September 30, 2017 and 2018, June 30, 2017 and 2018, and March 31, 2017 and 2018, respectively, were provided in the Company's annual report on Form 10-K for the year ended December 31, 2018, filed with the SEC on April 15, 2019 (the "Restatement"). For example, for the fiscal year ended December 31, 2016, provision for doubtful accounts was adjusted by $17,064,000. As originally reported for the fiscal year ended December 31, 2016, the provision for doubtful accounts was $21,485,000. This was restated to $38,549,000. Similarly, for the fiscal year ended December 31, 2017, provision for doubtful accounts was adjusted by $10,982,000. As originally reported for the fiscal year ended December 31, 2017, the provision for doubtful accounts was $36,914,000. This was restated to $25,932,000.

151.    The Restatement included the restatements and adjustments reflected in the following chart:

| (in thousands, except share data) | | Year Ended, December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2017 | | 2016 | | 2015 | |
| Provision for doubtful accounts | As Previously Reported | $ | 36,914 | $ | 21,485 | $ | 18,113 |
| | Adjustments | $ | (10,982) | $ | 17,064 | $ | 24,268 |
| | Restated | $ | 25,932 | $ | 38,549 | $ | 42,381 |
| | | | | | | | |
| Income (loss) from operations | As Previously Reported | $ | (7,743) | $ | (636) | $ | 14,228 |
| | Adjustments | $ | 10,982 | $ | (17,064) | $ | (24,268) |
| | Restated | $ | 3,239 | $ | (17,700) | $ | (10,040) |
| | | | | | | | |
| Net (loss) income | As Previously Reported | $ | (25,087) | $ | (5,741) | $ | 8,341 |
| | Adjustments | $ | 7,706 | $ | (20,629) | $ | (23,787) |
| | Restated | $ | (17,381) | $ | (26,370) | $ | (15,446) |

- 43 -

| Basic (loss) earnings per common share | As Previously Reported | $ | (0.88) | $ | (0.03) | $ | 0.49 |
|---|---|---|---|---|---|---|---|
| | Adjustments | $ | 0.33 | $ | (0.90) | $ | (1.11) |
| | Restated | $ | (0.55) | $ | (0.93) | $ | (0.62) |
| Diluted (loss) earnings per common share | As Previously Reported | $ | (0.88) | $ | (0.03) | $ | 0.48 |
| | Adjustments | $ | 0.33 | $ | (0.90) | $ | (1.10) |
| | Restated | $ | (0.55) | $ | (0.93) | $ | (0.62) |

152.    The Restatement also included the following adjustments made to AAC's quarterly reports filed with the SEC during the Relevant Period:

| | Quarter Ended | | | | | | |
|---|---|---|---|---|---|---|---|
| | March 31, Restated | | June 30, Restated | | September 30, Restated | | December 31, |
| | (In thousands except share data) | | | | | | |
| **2018:** | | | | | | | |
| Revenue | $ | 81,187 | $ | 88,094 | $ | 69,034 | $ | 57,448 | (a) |
| Net loss | $ | (837) | $ | (3,592) | $ | (23,844) | $ | (38,445) | (a),(b) |
| Net income (loss) available to AAC Holdings, Inc. common stockholders | $ | 1,056 | $ | (1,602) | $ | (22,181) | $ | (36,677) | (a),(b) |
| Basic net loss per share | $ | 0.04 | $ | (0.07) | $ | (0.92) | $ | (1.52) | |
| Diluted net loss per share | $ | 0.04 | $ | (0.07) | $ | (0.92) | $ | (1.52) | |

| | Quarter Ended | | | | | | |
|---|---|---|---|---|---|---|---|
| | March 31, Restated | | June 30, Restated | | September 30, Restated | | December 31, Restated |
| **2017:** | (In thousands except share data) | | | | | | |
| Revenue | $ | 73,039 | $ | 78,042 | $ | 80,424 | $ | 86,136 | |
| Net (loss) income | $ | (766) | $ | 158 | $ | 715 | $ | (17,488) | (c) |
| Net (loss) income available to | $ | 275 | $ | 1,140 | $ | 1,841 | $ | (16,129) | (c) |

- 44 -

| AAC Holdings, Inc. common stockholders | | | | | | | |
|---|---|---|---|---|---|---|---|
| Basic net (loss) income per share | $ | 0.01 | $ | 0.05 | $ | 0.08 | $ | (0.69) |
| Diluted net (loss) income per share | $ | 0.01 | $ | 0.05 | $ | 0.08 | $ | (0.69) |

153.    Furthermore, the Restatement included the following adjustments to the Company's previously charged provision for doubtful accounts:

| | | |
|---|---|---|
| Balance at December 31, 2015, restated | $ | 41,145 |
| Additions charged to provision for doubtful accounts | | 38,549 |
| Accounts written off, net of recoveries | | (10,234) |
| Balance at December 31, 2016, restated | $ | 69,460 |
| Additions charged to provision for doubtful accounts | | 25,932 |
| Accounts written off, net of recoveries | | (6,968) |
| Balance at December 31, 2017, restated | $ | 88,424 |
| | | |
| Balance at January 1, 2018 [(1)] | $ | - |
| Additions charged to provision for doubtful accounts | | 366 |
| Accounts written off, net of recoveries | | (366) |
| Balance at December 31, 2018 | | |

**Repurchases During the Relevant Period**

154.    During the period in which the Company made false and or misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company, which overpaid an aggregate amount of at least $672,189 for repurchases of its own stock during the Relevant Period.

155.    According to the 1Q17 10-Q, during the three months ended March 31, 2017, the Individual Defendants caused the Company to repurchase 13,613 shares of its own common stock at an average price per share of approximately $8.53, for a total cost to the Company of approximately $116,118.

- 45 -

156. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $7.17 more than the actual worth of each share during the three months ended March 31, 2017. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended March 31, 2017 was approximately $97,605.

157. According to the 2Q17 10-Q, during the three months ended June 30, 2017 the Individual Defendants caused the Company to repurchase 11,081 shares of its own common stock at an average price per share of approximately $6.93, for a total cost to the Company of approximately $76,791.

158. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $5.57 more than the actual worth of each share during the three months ended June 30, 2017. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended June 30, 2017 was approximately $61,721.

159. According to the 3Q17 10-Q, during the three months ended September 30, 2017, the Individual Defendants caused the Company to repurchase 11,992 shares of its own common stock at an average price per share of approximately $9.93, for a total cost to the Company of approximately $119,080.

160. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $8.57 more than the actual worth of each share during the three months ended September 30, 2017. Thus, the total over payment by the Company for

repurchases of its own stock during the three months ended September 30, 2017 was approximately $102,771.

161. According to the 2017 10-K, during the three months ended December 31, 2017 the Individual Defendants caused the Company to repurchase 38,797 shares of its own common stock at an average price per share of approximately $9.00 to $9.17, for a total cost to the Company of approximately $350,071.

162. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $7.64 to 7.81 more than the actual worth of each share during the three months ended December 31, 2017. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended December 31, 2017 was approximately $297,307.

163. According to the 1Q18 10-Q, during the three months ended March 31, 2018, the Individual Defendants caused the Company to repurchase 4,145 shares of its own common stock at an average price per share of approximately $11.48, for a total cost to the Company of approximately $47,584.

164. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $10.12 more than the actual worth of each share during the three months ended March 31, 2018. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended March 31, 2018 was approximately $41,947.

165. According to the 2Q18 10-Q, during the three months ended June 30, 2018, the Individual Defendants caused the Company to repurchase 3,462 shares of its own common stock at an average price per share of approximately $9.37, for a total cost to the Company of approximately $32,438.

166. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $8.01 more than the actual worth of each share during the three months ended June 30, 2018. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended June 30, 2018 was approximately $27,730.

167. According to the 3Q18 10-Q, during the three months ended September 30, 2018, the Individual Defendants caused the Company to repurchase 3,518 shares of its own common stock at an average price per share of approximately $7.63, for a total cost to the Company of approximately $26,842.

168. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $6.27 more than the actual worth of each share during the three months ended September 30, 2018. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended September 30, 2018 was approximately $22,057.

169. According to the 2018 10-K, during the three months ended December 31, 2018, the Individual Defendants caused the Company to repurchase 17,864 shares of its own common

stock at an average price per share of approximately $1.40 to $7.00, for a total cost to the Company of approximately $45,343.

170. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $0.04 to $5.64 more than the actual worth of each share during the three months ended December 31, 2018. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended December 31, 2018 was approximately $21,048.

## DAMAGES TO AAC

171. As a direct and proximate result of the Individual Defendants' conduct, AAC will lose and expend many millions of dollars.

172. Such losses include the Company's overpayment by approximately $672,189 for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

173. Such expenditures include, but are not limited to costs associated with required restatements of the Company's financial results and operations for the periods discussed herein, legal fees associated with the Securities Class Action filed against the Company, its CEO, CFO and former CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

174. Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

- 49 -

175.     As a direct and proximate result of the Individual Defendants' conduct, AAC has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

176.     Plaintiff brings this action derivatively and for the benefit of AAC to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of AAC, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

177.     AAC is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

178.     Plaintiff is, and has been at all relevant times, an AAC shareholder. Plaintiff will adequately and fairly represent the interests of AAC in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

179.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

180.     A pre-suit demand on the Board of AAC is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Cartwright, Blackburn, Bostelman, Burch, Cash, Freeman and Hillis (the "Directors"). Plaintiff

- 50 -

needs only to allege demand futility as to four of the seven Directors who were on the Board at the time this action was commenced. According to the 2018 Proxy Statement, Directors Cartwright, Blackburn, and Hillis are non-independent directors.

181.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices and while two of them engaged in insider sales based on material non-public information, netting proceeds of over $4.8 million in proceeds, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

182.   Demand is also excused as to all of the Directors because the unlawful business strategy that the Company engaged in was not a valid exercise of business judgment. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

183.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the conduct alleged herein. The fraudulent scheme was intended to make the Company appear more stable, profitable, and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

184.   Additional reasons that demand on Defendant Cartwright is futile follow. Defendant Cartwright has served as the Company's CEO since 2013 and as the Chairman of the

Board since 2011. Thus, as the Company admits, he is a non-independent director. Defendant Cartwright also serves as a member of the Compliance and Quality Care Committee. The Company provides Defendant Cartwright with his principal occupation, and he receives handsome compensation, including $950,449 during the fiscal year ended December 31, 2018. Defendant Cartwright was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing quarterly reports described herein filed on Form 10-Qs with the SEC as well as the 2016 10-K and 2017 10-K, which he signed and signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded at least $4.7 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Additionally, pursuant to a written lease agreement with AMC, Inc., a company that Defendant Cartwright beneficially owns, the Company pays AMC, Inc. an hourly rate for use of its airplane. According to the 2017 Proxy Statement and the 2018 Proxy Statement, respectively, AAC paid AMC, Inc. $893,195 and $1 million for airplane use in the fiscal years ended December 31, 2016 and 2017, respectively. Defendant Cartwright's beneficial ownership of the entity, AMC, Inc., which received a substantial amount of money from the Company during the Relevant Period further supports Defendant Cartwright's inability to entertain a demand with the requisite disinterestedness and independence. Moreover, Defendant Cartwright is a defendant in the Securities Class Action. For these reasons, too, Defendant

- 52 -

Cartwright breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185. Additional reasons that demand on Defendant Blackburn is futile follow. Defendant Blackburn has served as a Company director since 2018. He also serves as a member of the Compliance and Quality Care Committee. Defendant Blackburn receives handsome compensation, including $140,000 during the fiscal year ended December 31, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale before the fraud was exposed, which yielded at least $180,000 in proceeds, demonstrates his motive in facilitating and participating in the fraud. Furthermore, Defendant Blackburn signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, too, Defendant Blackburn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

186. Additional reasons that demand on Defendant Bostelman is futile follow. Defendant Bostelman has served as a Company director since 2012. He also serves as Chairman of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Bostelman receives handsome compensation, including $170,000 during the fiscal year ended December 31, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the

- 53 -

scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Bostelman is significant owner and executive officer of Vaco. Vaco Nashville, LLC is an entity of Vaco that has placement agreements with AAC. Typically, the agreement is for Vaco Nashville, LLC to provide accounting professionals to AAC and, in return, AAC pays Vaco Nashville, LLC 25% of the employee's first year salary. For the 2016 fiscal year, AAC paid Vaco Nashville, LLC, an aggregate amount of $154,486. Due to Defendant Bostelman being a significant owner and executive officer of Vaco, he is clearly not a disinterested director of AAC's Board. Furthermore, Defendant Bostelman signed, and thus personally made the false and misleading statements in the 2016 10-K and the 2017 10-K. For these reasons, too, Defendant Bostelman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187. Additional reasons that demand on Defendant Burch is futile follow. Defendant Burch has served as a Company director since October 2012. He also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Burch receives handsome compensation, including $140,000 during the fiscal year ended December 31, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Burch signed, and thus personally made the false and misleading statements in the 2016 10-K and the 2017 10-K. For these reasons, too, Defendant Burch breached his fiduciary

- 54 -

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188. Additional reasons that demand on Defendant Cash is futile follow. Defendant Cash has served as a Company director since April 2017. He also serves as Chairman of the Audit Committee and as a member of the Compensation Committee. Defendant Cash receives handsome compensation, including $210,000 during the fiscal year ended December 31, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Cash signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, too, Defendant Cash breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

189. Additional reasons that demand on Defendant Freeman is futile follow. Defendant Freeman has served as a Company director since 2014. He also serves as Chairman of the Nominating and Corporate Governance Committee and Chairman of the Compliance and Quality Care Committee and serves as a member of the Compensation Committee and as a member of the Audit Committee. Defendant Freeman receives handsome compensation, including $210,000 during the fiscal year ended December 31, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

- 55 -

Furthermore, Defendant Freeman signed, and thus personally made the false and misleading statements in the 2016 10-K and the 2017 10-K. For these reasons, too, Defendant Freeman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

190.    Additional reasons that demand on Defendant Hillis is futile follow. Defendant Hillis has served as a Company director since 2018. He also serves as a member of the Compliance and Quality Care Committee. Defendant Hillis receives handsome compensation, including $140,000 during the fiscal year ended December 31, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Burch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191.    Additional reasons that demand on the Board is futile follow.

192.    As described above, two of the Directors on the Board directly engaged in insider trading, in violation of federal law. They received proceeds of over $4.8 million as a result of their insider transactions. These aforementioned transactions were executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

193.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, and one of whom is a defendant in the Securities Class Action, control the Company and are beholden to each other. The Directors have longstanding business and

- 56 -

personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, according to the 2017 and 2018 Proxy Statements, some of the top executives and directors have familial relationships with other employees who receive substantial compensation. According to the 2017 and 2018 Proxy Statements, Defendant Cartwright's wife is also an employee of the Company and received $524,522 and $417,648 in compensation from the Company for the fiscal years ended December 31, 2016 and 2017, respectively. Further, Defendant Blackburn's wife was also an employee of the Company and received $496,296 in compensation from the Company for the fiscal year ended December 31, 2017. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

194.   Furthermore, Defendants Blackburn and Hillis, are both parties to transactions that render them unable to act as disinterested directors. For example, according to the 2017 Proxy Statement, on August 31, 2012, the Company acquired a company jointly owned by Defendant Blackburn. For this acquisition, Defendant Blackburn received millions of dollars from the Company; the last payment from the Company to Defendant Blackburn was in 2016. Likewise, according to the 2018 Proxy Statement, the Company acquired AdCare and AdCare Holding Trust on September 13, 2017. Defendant Hillis was a trustee of AdCare and a former director and officer AdCare. Defendant Hillis for consideration in the AdCare acquisition, among other things, was the sole designee of approximately $4.8 million shares of AAC common stock. These conflicts of interest precluded the Directors from adequately monitoring the Company's

- 57 -

operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile. In the 2018 Proxy Statement, the Company stated that Defendants Blackburn and Hillis were non-independent directors.

195.    In violation of the Audit Committee Charter, Defendants Cash and Freeman failed to ensure that AAC's public disclosures were full and accurate and that the Company complied with all relevant laws and regulations. Thus, as members of the Audit Committee, they face a substantial likelihood of liability and demand is futile as to them.

196.    In violation of the Quality Care and Compliance Charter, Defendants Cartwright, Blackburn, Freeman and Hillis failed to ensure proper compliance with, and enforcement of, the applicable laws and regulations and the Company's own policies. Thus, as members of the Quality Care and Compliance Committee, they face a substantial likelihood of liability and demand is futile as to them.

197.    Additionally, each one of the Directors, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by at least $672,189 for its own common stock during the period in which the false and misleading statements were made. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

198.    AAC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against

themselves or others who were responsible for that wrongful conduct to attempt to recover for AAC any part of the damages AAC suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

199. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

200. The acts complained of herein constitute violations of fiduciary duties owed by AAC's officers and directors, and these acts are incapable of ratification.

201. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of AAC. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of AAC, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit

- 59 -

is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

202. If there is no directors' and officers' liability insurance, then the Directors will not cause AAC to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

203. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

204. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

206. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

- 60 -

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

207.    Under the direction and watch of the Directors, the 2017 and 2018 Proxy Statements failed to disclose, *inter alia*, that:  (1) the Company did not have appropriate procedures and internal controls over financial reporting and disclosures that would accurately report adjustments related to estimates for accounts receivable, provision for doubtful accounts, and revenue;  (2) due to this, AAC misstated its financials and operating results in its annual reports filed for 2016 and 2017 as well as its quarterly reports filed through 2017 and 2018; (3) consequently, AAC had to restate its financial reports for those periods as they were deemed unreliable; and (4) AAC failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

208.    The Individual Defendants also caused the 2017 and 2018 Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ performance based compensation elements while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were based on unsound maintenance and safety protocols and therefore any compensation based on the Company's financial performance was artificially inflated.

209.    The 2017 and 2018 Proxy Statements also made references to the Company's Code of Conduct. The Code of Conduct required the Company and Individual Defendants to abide by relevant laws and statutes. By engaging in the False and Misleading Statements and insider trading, the Individual Defendants violated the Code of Conduct. The 2017 and 2018

- 61 -

Proxy Statements failed to disclose these violations and also failed to disclose that the terms of the Code of Conduct were being violated.

210.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 and 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 and 2018 Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and the approval the terms and amendments to certain equity incentive plans.

211.    The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Cartwright, Bostelman, Burch, Freeman and Kloeppel, which allowed them to continue breaching their fiduciary duties to AAC.

212.    The false and misleading elements of the 2018 Proxy Statement led to the re-election of Defendants Cartwright, Blackburn, Bostelman, Burch, Cash, Freeman and Hillis which allowed them to continue breaching their fiduciary duties to AAC.

213.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 and 2018 Proxy Statements.

214.    Plaintiff, on behalf of AAC, has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of
Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

215.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

- 62 -

216.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding AAC. Not only is AAC now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon AAC by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 104,472 of its own shares on the open market at artificially inflated prices, damaging AAC by $672,189.

217.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

218.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about AAC not misleading.

219.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements

disseminated by AAC. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

220.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director would have signed the Company's false and misleading Form 10-K's filed with the SEC during the Relevant Period, including Defendants Cartwright, McWilliams, Bostelman, Burch, Freeman, Kloeppel and Ragsdale who signed the 2016 10-K, and Defendants Cartwright, McWilliams, Blackburn. Bostelman, Burch, Cash, Freeman, Kloeppel, Ragsdale and Rouson who signed the 2017 10-K.

221.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

222.    Plaintiff on behalf of AAC has no adequate remedy at law.

- 64 -

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a)
### of the Securities Exchange Act of 1934

223. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

224. The Individual Defendants, by virtue of their positions with AAC and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of AAC and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause AAC to engage in the illegal conduct and practices complained of herein.

225. Plaintiff, on behalf of AAC, has no adequate remedy at law.

### FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

226. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

227. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AAC's business and affairs.

228. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

229. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The

- 65 -

Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AAC.

230.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

231.    Also in breach of their fiduciary duties owed to AAC, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact to the investing public that failed to disclose, *inter alia*, that: (1) the Company did not have appropriate procedures and internal controls over financial reporting and disclosures that would accurately report adjustments related to estimates for accounts receivable, provision for doubtful accounts, and revenue;  (2) due to this, AAC misstated its financials and operating results in its annual reports filed for 2016 and 2017 as well as its quarterly reports filed through 2017 and 2018; (3) consequently, AAC had to restate its financial reports for those periods as they were deemed unreliable; and (4) AAC failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

232.    In breach of their fiduciary duties, three of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

233.    In further breach of their fiduciary duties owed to AAC, the Individual Defendants willfully or recklessly caused the Company to repurchase nearly $814,271 worth of Company stock at artificially inflated prices.

- 66 -

234.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AAC's securities and disguising insider sales.

235.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AAC's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

236.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

237.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AAC has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

- 67 -

238.     Plaintiff on behalf of AAC has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

239.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

240.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AAC.

241.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from AAC that was tied to the performance or artificially inflated valuation of AAC, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

242.     Plaintiff, as a shareholder and a representative of AAC, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including from insider sales and any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

243.     Plaintiff on behalf of AAC has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

244.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

- 68 -

245. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence AAC, for which they are legally responsible.

246. As a direct and proximate result of the Individual Defendants' abuse of control, AAC has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, AAC has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

247. Plaintiff on behalf of AAC has no adequate remedy at law.

<u>**SEVENTH CLAIM**</u>

**Against Individual Defendants for Gross Mismanagement**

248. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

249. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of AAC in a manner consistent with the operations of a publicly-held corporation.

250. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, AAC has sustained and will continue to sustain significant damages.

251. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

252. Plaintiff, on behalf of AAC, has no adequate remedy at law.

- 69 -

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

253.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused AAC to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

255.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

256.     Plaintiff, on behalf of AAC, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of AAC, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to AAC;

(c)     Determining and awarding to AAC the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing AAC and the Individual Defendants to take all necessary actions

to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AAC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of AAC to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding AAC restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 3, 2019

Respectfully submitted,

s/*Paul Kent Bramlett*
PAUL KENT BRAMLETT
TN #7387/MS#4291
ROBERT PRESTON BRAMLETT
TN #25985
**Bramlett Law Offices**
P. O.  Box 150734
Nashville, TN 37215-0734
Telephone:  615.248.2828
Facsimile:   866.816.4116
E-mails:  PKNASHLAW@Aaol.com
Robert@BramlettLawOffices.com

*Attorneys for Plaintiff*

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com